*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0417p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LARRY SKOWRONEK,

    *Plaintiff-Appellee,*

  *v.*

AMERICAN STEAMSHIP COMPANY,

    *Defendant-Appellant.*

No. 06-1918

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 05-73961—Nancy G. Edmunds, District Judge.

Argued: June 7, 2007

Decided and Filed: October 12, 2007

Before: CLAY, GILMAN, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Thomas W. Emery, GARAN LUCOW MILLER, Detroit, Michigan, for Appellant. Dennis M. O'Bryan, O'BRYAN BAUN COHEN KUEBLER KARAMANIAN, Birmingham, Michigan, for Appellee. **ON BRIEF:** Thomas W. Emery, Caryn A. Gordon, GARAN LUCOW MILLER, Detroit, Michigan, for Appellant. Dennis M. O'Bryan, O'BRYAN BAUN COHEN KUEBLER KARAMANIAN, Birmingham, Michigan, for Appellee.

  McKEAGUE, J., delivered the opinion of the court, in which GILMAN, J., joined. CLAY, J. (pp. 8-15), delivered a separate dissenting opinion.

---

## OPINION

---

  McKEAGUE, Circuit Judge. In this case, we consider the validity of a maintenance rate that is applicable to ill crew members and is one of the terms of a collective bargaining agreement (CBA). The CBA contained, inter alia, a maintenance rate of $56.00 per week for ill crew members and a rate of $300.00 per week for injured crew members. Due to this differential treatment, the district court granted Plaintiff-Appellee Larry Skowronek, an ill crew member, summary judgment and awarded him the injured crew member rate. We REVERSE.

1

# I. BACKGROUND

The facts in this case are not in dispute. Skowronek was employed as a wheelsman aboard Defendant-Appellant American Steamship Company's ship, the M/V John J. Boland. On September 3, 2004, while at sea, Skowronek suffered a heart attack. He departed the ship at that time, and he remained unfit for duty until December 2, 2004. As a member of the Seafarer's International Union while he was employed by American Steamship, the terms and conditions of Skowronek's employment were governed by a CBA between his union and his employer. The portion of the CBA relevant to this case provides:

> The Weekly Recovery Stipend shall be paid at the rate of three hundred dollars ($300.00) weekly and will be composed of fifty-six dollars ($56.00) maintenance (eight dollars ($8.00) per day contractual rate) and two hundred forty-four dollars ($244.00) contractual support benefit.
>
> Such payments are an obligation of the employer to an employee who suffered an injury aboard the ship covered under Maritime Law, which incapacitates him for at least seven (7) days and shall be due and payable not less frequently than each second week anniversary of the injury. Such coverage shall be retroactive to the date of injury. The injured seaman must see a doctor chosen by the employer at reasonable times when requested. Unless mutually extended, payments will not exceed one (1) year.
>
> The payment of this benefit shall constitute satisfaction of the obligation to pay maintenance but otherwise shall not constitute a waiver or be deemed to lessen any legal or contractual rights held by such injured employee. It is agreed that the Weekly Recovery Stipend is separate and distinct from any other rights and options of the employee, except as specified above.
>
> When a member of the unlicenced personnel is entitled to maintenance under the Maritime Law, he shall be paid maintenance at the rate of eight ($8.00) per day for each day or part thereof of entitlement, upon presentation of a medical abstract. This payment shall be made regardless of whether he or she has or has not retained an attorney, filed a claim for damages, or taken any other steps to that end. The payments due hereunder shall be paid in a timely manner, generally not less frequently than twice monthly.

*Skowronek v. Am. S.S. Co.*, No. 05-73961, 2006 WL 1494947, at *1 (E.D. Mich. May 25, 2006). Thus, the CBA provides that injured crew members are entitled to payments of $300.00 per week for the time they are unfit for duty. That amount includes an $8.00 per day maintenance payment. Ill crew members, however, are entitled only to the $8.00 per day maintenance payment.

American Steamship therefore paid Skowronek $56.00 per week during the period he was unfit for duty. On September 8, 2005, he commenced an action in Michigan state court in which he sought $300.00 per week for the period. He complained that the CBA discriminated against ill crew members. American Steamship removed the case to the United States District Court for the Eastern District of Michigan. Both parties filed motions for summary judgment, and on May 25, 2006, the district court granted Skowronek's motion and denied American Steamship's. The latter filed a timely appeal.

# II. ANALYSIS

This Court reviews a district court's grant of summary judgment under the *de novo* standard. *Nichols v. Moore*, 477 F.3d 396, 398 (6th Cir. 2007). Summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court must draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under United States maritime law, "maintenance" is the shipowner's duty to provide food and lodging to a seaman who becomes ill or injured while in the service of the ship. *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962). The right to maintenance is related to the right to cure, which is "care, including nursing and medical attention during such period as the duty continues." *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938). The shipowner's duty to pay maintenance continues until either the seaman has recovered or his condition is declared permanent. *Vella v. Ford Motor Co.*, 421 U.S. 1, 5 (1975). The duty exists irrespective of both whether the shipowner was negligent and whether the illness or injury is job-related. *Id.* at 4. Maintenance has traditionally been said to serve three purposes: "(1) to protect the poor and improvident seaman while ill in foreign ports, (2) to encourage shipowners to protect the seaman's safety and health while in service, and (3) to induce employment in the merchant marine." *Gardiner v. Sea-Land Serv., Inc.*, 786 F.2d 943, 946 (9th Cir. 1986) (citing *Vella*, 421 U.S. at 3-4).

The issue in this case is whether the maintenance rate of $56.00 per week applicable to ill crew members is enforceable even though injured crew members are entitled to a rate of $300.00 per week, where those provisions are part of a CBA that contains several other terms governing the working conditions of union crew members. We hold that it is.

Federal appellate courts have all but uniformly concluded that maintenance rates specified in a CBA will be enforced, regardless of whether they actually cover a crew member's daily food and lodging expenses. Indeed, in addition to our decision in *Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 588 (6th Cir. 1989), the First, Second, Fifth, Ninth, and Eleventh Circuits have so held.[1] The Third Circuit's decision in *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 640 (3d Cir. 1990), stands alone in holding to the contrary. The analysis in *Gardiner*, on which we and our sister circuits have relied, considered the enforceability of maintenance rates in the context of national labor policy. *See* 786 F.2d at 948. Specifically, the Ninth Circuit noted that such policy is predicated on the assumption that employees bargain most effectively by acting through freely chosen labor organizations. *Id.* Consequently, it would not "lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement"; rather, it would "choose the rule that w[ould] promote the enforcement of collective bargaining agreements." *Id.* The court further emphasized that "it is clearly the policy of our national labor legislation to encourage both labor and management to negotiate contracts that will effectively regulate every aspect of their complex relationship." *Id.* at 948-49. Thus, because the parties in that case included a maintenance rate in the CBA, "[t]he national labor policy of promoting and encouraging collective bargaining agreements would be unduly compromised were we to conclude" that the rate was anything but "a consequence of the normal 'give and take' process of collective bargaining"; therefore, the rate is "entitled to the same reliability accorded to other terms and conditions within the same agreement." *Id.* at 949.

The Ninth Circuit emphasized that the maintenance rate "is but one of many elements contained within the Union contract and over which the parties negotiate, and there may be a considerable amount of 'give and take' exercised by the parties in coming to a final agreement on all of the elements." *Id.* Consequently, the maintenance rate's adequacy "should not be examined

---

[1] *See Ammar v. United States*, 342 F.3d 133, 147 (2d Cir. 2003); *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1292 (11th Cir. 2000); *Baldassaro v. United States*, 64 F.3d 206, 212-13 (5th Cir. 1995); *Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir. 1989); *Gardiner*, 786 F.2d at 949-50.

in isolation by the court because the determination of its adequacy in relation to the whole scheme of benefits has already been made by the union and the seamen who voted for the contract." *Id.* Therefore, *Gardiner* held that "when a benefits package includes an express reference to a precise rate of maintenance, the adequacy of this rate, considered in isolation, is not a subject for judicial speculation when the rate is part of a total package of wages and benefits resulting from the process of collective bargaining." *Id.*

Like many of our sister circuits, we have found *Gardiner*'s reasoning persuasive, and we have accordingly adopted it. In *Al-Zawkari*, the plaintiff crew member who had become ill aboard the defendant's ship instituted an action in which he argued that the maintenance paid to him was both insufficient and "in conflict with the intent and purpose of the Supreme Court's decisions imposing the maintenance requirement upon shipowners." 871 F.2d at 586. The plaintiff was a member of the Seafarers' International Union, and the union had a CBA with the defendant providing that the plaintiff was entitled to maintenance of $8.00 per day. *Id.* at 587.

Relying heavily on *Gardiner*, we affirmed the district court's judgment in favor of the defendant. *Id.* at 588, 590. We began by noting that the duty to provide maintenance can be modified and defined by contract even if it cannot be entirely abrogated. *Id.* at 588 (citing *Gardiner*, 786 F.2d at 949). We then adopted *Gardiner*'s rationale in emphasizing that "when a benefits package includes an express reference to a precise rate of maintenance, *it must be presumed that this rate was arrived at by negotiation*." *Id.* at 588 (emphasis added). Thus, we reasoned that maintenance rates, like any other benefit that is the ultimate result from give and take collective bargaining between parties, should be binding on them. *Id.* We therefore concluded that the $8.00 per day rate fixed by the CBA was enforceable, as we also noted that "[c]ourts generally have decided that it is more appropriate for the courts to enforce privately negotiated contractual rates of maintenance, rather than engaging in overt legislation of particular dollar figures." *Id.*

*Al-Zawkari* provides strong guidance for our conclusion that the district court erred. As set forth above, the CBA includes a maintenance rate of $8.00 per day. Therefore, a presumption that the rate was arrived at by negotiation attaches. *See Al-Zawkari*, 871 F.2d at 588. Skowronek has not rebutted that presumption. Indeed, he does not allege that the agreement was not legitimately negotiated, that the CBA was unfair as a whole, or that he was not adequately represented by the union. It therefore follows that we must conclude that the maintenance rate specified in the CBA was the result of "give and take collective bargaining between the parties." *See id.* Consequently, that rate is binding on the parties pursuant to *Al-Zawkari*. *Id.*

Although courts are not to usurp the collective bargaining process by selecting various portions of a CBA with which they do not agree and legislating particular dollar figures, *see id.*, this is not to say that a plaintiff crew member can never overcome the presumption of negotiation afforded to the terms of a collective bargaining agreement. However, pursuant to *Al-Zawkari*, the burden properly rests on the plaintiff to produce evidence that a bona fide negotiation did not take place, that the CBA was unfair, or that he was not adequately represented. 871 F.2d at 588; *see also Ammar*, 342 F.3d at 146; *Baldassaro*, 64 F.3d at 213; *Gardiner*, 786 F.2d at 949. Skowronek has only presented a portion of the CBA showing that different payments apply to injured and ill crew members. This evidence does not permit us to determine the fairness of either the negotiation or the CBA, or the adequacy of the union's representation of Skowronek. As *Gardiner* emphasized, "[t]he adequacy of the maintenance rate should not be examined in isolation by the court because the determination of its adequacy in relation to the whole scheme of benefits has already been made by the union and the seamen who voted for the contract." 786 F.2d at 949.

Although the CBA here provides a different level of payment for ill and injured crew members, that distinction does not prevent *Al-Zawkari* from providing strong persuasive authority. The court below, focusing on that distinction, relied heavily on a decision by another district court

that invalidated a provision that "discriminate[d] between sick and injured sailors by withholding payment to sick sailors." *Vitco v. Joncich*, 130 F. Supp. 945, 950 (S.D. Cal. 1955), *aff'd*, 234 F.2d 161 (9th Cir. 1956). However, that case preceded both *Al-Zawkari* and *Gardiner* by several decades, and the Second Circuit recently concluded that the need for courts to intervene to protect seamen "has been substantially lessened." *Ammar*, 342 F.3d at 146. Additionally, requiring collective bargaining agreements to contain the same payments for ill and injured crew members contravenes this Court's recognition that it is not appropriate for courts to engage in overt legislation of particular dollar figures in connection with privately negotiated payments. *See Al-Zawkari*, 871 F.2d at 588.

The district court's application of *Vitco* to the instant case also runs afoul of *Gardiner*'s holding that "when a benefits package includes an express reference to a precise rate of maintenance, the adequacy of this rate, considered in isolation, is not a subject for judicial speculation when the rate is part of a total package of wages and benefits resulting from the process of collective bargaining." *Gardiner*, 786 F.2d at 949. Indeed, to the extent that the CBA in the instant case governed the crew members' wages, hours, and working conditions in addition to maintenance rates, examining the adequacy of the ill crew members' maintenance rate, whether in comparison to that of the injured crew members or otherwise, is inappropriate. The difference between the two rates indicates, if anything, that the parties actually considered and negotiated a departure from the typical rate of $8.00 per day. *See Ammar*, 342 F.3d at 143. Furthermore, invalidating the CBA in the instant case because of "discrimination" would create a rule that allows crew members to bargain for an across-the-board $8.00 maintenance rate per *Al-Zawkari*, but prevents crew members from increasing benefits for injured crew members absent an attendant increase for ill crew members. Such a rule, of course, is contrary to the labor law policy of enforcing freely negotiated contracts, and would consequently undermine *Gardiner* and, by implication, *Al-Zawkari*.

Finally, we note that the district court also erred because *Vitco* is distinguishable from the instant case. Indeed, the present dispute, unlike *Vitco*, *see* 130 F. Supp. at 950, does not involve the entire abrogation of the maintenance payment; rather, it merely provides a lesser payment to ill crew members vis-a-vis injured crew members. This distinguishing feature is critical because this Court has emphasized that "[w]hile the duty to provide maintenance payments cannot be *entirely* abrogated, as an implied contractual provision, the right to maintenance can be modified and defined by contract." *Al-Zawkari*, 871 F.2d at 588; *see also Gardiner*, 786 F.2d at 949.

The dissent's several arguments in support of its conclusion that the district court should be affirmed fail to provide reason for us to depart from the overwhelming authority–from this Court and its sister circuits–cited above. First, the dissent asserts that if there were evidence in the record that the ill and injured crew members' maintenance payments were "actually negotiated," the majority position "might follow," yet it "refus[es] to infer actual good faith bargaining" and it therefore focuses its scrutiny on the two-tiered structure of maintenance rates while disregarding all other terms of the CBA. Dis. Op. at 12. The dissent's approach is contrary to this Court's precedent, and for that reason alone, it must be rejected. *See Al-Zawkari*, 871 F.2d at 588 ("[W]hen a benefits package includes an express reference to a precise rate of maintenance, *it must be presumed that this rate was arrived at by negotiation*.") (emphasis added).

But, undeterred by *Al-Zawkari*, the dissent continues by incorrectly stating, without authority, that the burden is on the shipowner to present evidence that the maintenance rate was specifically negotiated because "there is certainly no justification for making the seaman demonstrate an unfair procedure, as opposed to requiring the shipowner to demonstrate a fair one." Dis. Op. at 14. The justification for placing the burden on the seaman, however, is the presence of the maintenance rate in a mutually agreed upon CBA that governs the relationship between the shipowner and the seaman. *See Gardiner*, 786 F.2d at 948 (explaining that courts "will not lightly

embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement and will choose the rule that will promote [their] enforcement") (citation omitted). Thus, in the absence of proof offered by the seaman that the "CBA as a whole is unfair or that this seaman was not adequately represented by the Union," the maintenance rate is binding on the parties. *Baldassaro*, 64 F.3d at 213. Requiring the shipowner to prove that the individual maintenance rate was specifically negotiated overlooks the fact that the rate is "part of a total package of wages and benefits resulting from the process of collective bargaining." *Gardiner*, 786 F.2d at 949. We likewise refuse to countenance a rule requiring the shipowner to prove that a maintenance rate provision in a collective bargaining agreement was specifically negotiated.

Several of our sister circuits afford the same presumption of negotiation as *Al-Zawkari* in this context. Indeed, the Ninth Circuit specifically rejected the approach that the dissent employs today, as it noted that the plaintiff crew member in that case did not allege that the CBA as a whole was unfair or inadequate, which was "significant because we do not believe the rate of maintenance specified in the collective bargaining agreement can be examined in isolation." *Gardiner*, 786 F.2d at 949; *see also Ammar*, 342 F.3d at 146 (emphasizing that the plaintiff did not assert that the agreement was not legitimately negotiated, that his interests were not adequately represented, that the agreement as a whole was unfair, that the process was unfair, or that the maintenance provision was not a subject of the negotiation); *Baldassaro*, 64 F.3d at 213 (noting that the plaintiff did not allege that the collective bargaining agreement was unfair as a whole or that he was not adequately represented by the union). Just as in those cases, Skowronek makes no such allegations. Accordingly, the presumption of give and take negotiation attaches, and from that presumption it follows that the specific maintenance rate agreed upon by the parties is binding on them. *Al-Zawkari*, 871 F.2d at 588.

The dissent also asserts that it is "reluctant to give significant weight to the argument that the economic strength of unionized seamen requires the Court to acquiesce in the terms of the CBA." Dis. Op. at 12. In doing so, the dissent questions the premise upon which national labor policy has been built according to the Supreme Court, namely that by acting through a labor organization freely chosen by the majority, employees have the most effective means of bargaining for improvements in working conditions. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967). It also rejects the finding of one of our sister circuits that seamen "are a well-organized work force with sophisticated leaders who constantly press for better working conditions" as well as that circuit's conclusion that "the need for judicial intervention to protect seamen has been substantially lessened." *Ammar*, 342 F.3d at 146. It therefore follows that by insisting that the courts intervene in privately negotiated CBAs "to ensure that seamen are economically protected against the hardships that accompany illness or injury," Dis. Op. at 12, the dissent rejects the reasoning upon which our decision in *Al-Zawkari* and our five sister circuits cited above is based.[2]

As stated above, our precedent, like that of our sister circuits, affords a presumption of negotiation to a rate of maintenance specified in a collective bargaining agreement and recognizes that it is not appropriate for courts to engage in legislation of dollar figures in connection with privately negotiated maintenance rates. *Al-Zawkari*, 871 F.2d at 588. Because Skowronek has failed to produce any evidence demonstrating that the CBA was not a legitimately negotiated agreement, that his interests were not adequately represented in the negotiation process, or that the agreement as a whole is unfair, he has not rebutted the presumption of negotiation. Accordingly,

---

[2]For many of the same reasons, we find unpersuasive the dissent's arguments that the district court should be affirmed because seamen are wards of admiralty courts and because neither the Supreme Court nor any federal appellate court has addressed the precise factual scenario of the instant case. We also note that this Court has rejected an argument similar to the one the dissent employs today. *See Al-Zawkari*, 871 F.2d at 586 (rejecting the plaintiff crew member's contention that the maintenance rate paid to him was "in conflict with the intent and purpose of the Supreme Court's decisions imposing the maintenance requirement upon shipowners").

our precedent requires us to give binding effect to the maintenance rate at issue.  *Id.*  We refuse to examine it in isolation, as it is but one of many terms of the CBA.

### III.  CONCLUSION

For the foregoing reasons, we REVERSE the decision of the district court and REMAND the case for further proceedings consistent with this opinion.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting. The collective bargaining agreement presently before the court contains an unusual provision that discriminates between ill and injured seamen. This provision is inconsistent with the common law of admiralty, and at odds with the reasons why courts originally developed and protected seamen's right to maintenance. The majority disputes none of this. Instead, the majority reverses the judgment of the district court, relying almost exclusively on the holdings of *Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585 (6th Cir. 1989) and *Gardiner v. Sea-Land Service, Inc.*, 786 F.2d 943 (9th Cir. 1986), which it misconstrues. In my view, the record in this case does not provide a sufficient basis for upholding the collective bargaining agreement. I would therefore affirm the judgment of the district court.

**I**

This question in this case concerns the contours of a shipowner's duty to provide maintenance and cure. "Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service." *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962). The right to maintenance and cure has ancient origins, and has been universally recognized by maritime nations. *See The Iroquois*, 194 U.S. 240, 241-42 (1904); *see also O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42 (1943) (tracing the right of maintenance to the twelfth century Laws of Oleron). It was recognized in United States jurisprudence in the seminal case of *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D.Me. 1823) (Story, J.), and was adopted and defined by the Supreme Court in *The Osceola*, 189 U.S. 158, 175 (1903).

"Maintenance refers to a shipowner's obligation to provide a mariner with food and lodging if he becomes injured or falls ill while in service of the ship, while cure alludes to the duty to provide necessary medical care and attention." *Blainey v. Am. S.S. Co.*, 990 F.2d 885, 887 (6th Cir. 1993). Traditionally, the amount of maintenance was measured by reference to value of food and lodging provided to the seaman by the ship. *Springborn v. Am. Commercial Barge Lines, Inc.*, 767 F.2d 89, 94 (5th Cir. 1985) (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938)). The duty to provide maintenance arises upon the onset of illness or injury, *see Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1359 (6th Cir. 1996), and continues until the seaman reaches maximum medical recovery. *See Vaughan*, 369 U.S. at 531. The seaman's entitlement to maintenance attaches so long as he is in "the service of the ship" at the time that he is afflicted with injury or illness. *Farrell v. United States*, 336 U.S. 511, 516 (1949). If the seaman was answerable to the ship's call, the negligence of the seaman is irrelevant, and his claims for maintenance will not be denied except for cases of gross misconduct or insubordination. *Id.*

There exist two classic and interrelated justifications for the right of maintenance: the protection of seamen, whose circumstances subject them to unique perils; and the promotion of a merchant marine, which is beneficial to the economic well-being of the nation as a whole. *Vella v. Ford Motor Co.*, 421 U.S. 1, 3-4 (1975) (citing *Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 727 (1943)). In the oft-quoted words of Justice Story, then riding circuit, seamen "are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment." *Harden*, 11 F. Cas. at 483. By aligning the interest of the seamen in maintaining their health with the economic concerns of the shipowner, the shipowner is induced to watch over the health of the seamen with "vigilance and fidelity." *Id.* The shipowner, and the country at large, also stand to gain. Maintenance "encourages seamen to engage in perilous voyages

with more promptitude, and at lower wages," it also "diminishes the temptation of pluderage upon the approach of sickness[] and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw." *Id.*

The same characteristics of seamen that have caused courts to vouchsafe their right to maintenance have also induced courts to profess that seamen are "emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs." *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246 (1942) (quoting *Harden*, 11 F. Cas. at 485). The Supreme Court has consistently reiterated and never shied away from this wardship theory. *See, e.g.*, *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354-55 (1995); *Vaughan*, 369 U.S. at 531-32; *Aguilar*, 318 U.S. at 732 n.15; *Taylor*, 303 U.S. at 529. As stated in *Vaughan*, admiralty courts interpret the duty of maintenance "for the benefit and protection of seamen," resolving ambiguities or doubts in their favor. 369 U.S. at 531-32.

These considerations have undoubtedly influenced the Supreme Court's view that maintenance is something other than a fully alienable right. As Justice Cardozo explained in *Cortes v. Baltimore Insular Line*, "[t]he duty to make such provision is imposed by the law itself as one annexed to the employment. Contractual it is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident." 287 U.S. 367, 371 (1932) (citation omitted).

## II

The Sixth Circuit, like the majority of circuits, has modified the common law of maintenance as applied to collective bargaining agreements. In *Al-Zawkari*, the Court held that while a shipowner's "duty to provide maintenance cannot be *entirely* abrogated, as an implied contractual provision, the right to maintenance can be modified and defined by contract." 871 F.2d at 588. *Al-Zawkari* followed the trail blazed by the Ninth Circuit in *Gardiner*, which held that a bargained-for rate of maintenance resulting from the "give and take" of the collective bargaining process must be enforced according to its terms. 786 F.2d at 949. The reasoning of *Gardiner* has tended to carry the day; of the six circuits to consider this issue in *Gardiner*'s wake, five courts, including the First, Second, Fifth, Sixth and Eleventh circuits, have chosen to follow *Gardiner*'s lead. *See Ammar v. United States*, 342 F.3d 133, 146 (2d Cir. 2003); *Federick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1291-92 (11th Cir. 2000); *Baldassaro v. United States*, 64 F.3d 206, 212-13 (5th Cir. 1995); *Al-Zawkari*, 871 F.2d at 588; *Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir. 1989). Only the Third Circuit has adopted the contrary position. *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 640 (3d Cir. 1990). Under the reasoning of these cases, courts have upheld maintenance payments as low as $8.00 per day as late as 2003–despite the fact that the $8.00 rate dates back to the 1940s–with no pretensions that this inflation-ravaged rate could actually cover food and lodging equivalent to that which a seaman would receive on the ship. *See Ammar*, 342 F.3d at 143.

*Gardiner*'s view rests on several justifications. First and foremost, this view harmonizes the doctrine of maintenance with the policies underpinning labor law. *See Gardiner*, 786 F.2d at 948-49. "National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions." *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967). Collective bargaining agreements are to cover "the whole employment relationship." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579 (1960). Under this view, maintenance rates are not to be considered as separate and apart from the remainder of the negotiated relationship. Instead, the rate of maintenance is recognized to be merely one axis of the agreement between the union and the employer, with the amount of maintenance fixed in tandem with the other terms of the collective

bargaining agreement. *Gardiner*, 786 F.2d at 949. Intrinsic in this view is the premise that seamen as a whole are better off if they are allowed to exchange the economic protection against illness and injury afforded by the common law of maintenance for other benefits they more strongly desire. *See id.* (noting that the collective bargaining agreement provided for "overtime, premium and penalty pay for unpleasant tasks, for very generous vacation allowances, and for such amenities as television sets and feature films, washer/dryers, ice cream and fresh baked bread"); *Macedo*, 868 F.2d at 522 ("A union representing fisherman who, when they are ashore, are at home and not adrift at some foreign port, might recognize this circumstance and prefer to emphasize [a different contractual benefit]").

A closely related rationale has been offered by the Second Circuit in *Ammar*. Under *Ammar*'s view, the changed economic circumstances occasioned by the labor movement have rendered the policies of *Harden* obsolete:

> The modern reality is that most seamen are no longer "friendless"; rather, they have gained strength through collectivity, and they are a well-organized work force with sophisticated leaders who constantly press for better working conditions, pay, and benefits, as well as increased job security. Thus, the need for judicial intervention to protect seamen has been substantially lessened. Recognizing both the goal of providing protection for injured seamen and the importance of collective bargaining to industrial peace, we conclude that, in light of the reality of modern circumstances, the appropriate accommodation between federal maritime common law and federal common law for the enforcement of collective bargaining agreements is to allow unionized seamen to bargain for rights and privileges they prefer in exchange for limiting the per diem rate of maintenance.

*Ammar*, 342 F.3d at 146.

Finally, in *Al-Zawkari*, this Court provided another reason for following *Gardiner*, namely, the institutional limitations of the judiciary. Accordingly, "[c]ourts generally have decided that it is more appropriate for the courts to enforce privately negotiated contractual rates of maintenance, rather than engaging in overt legislation of particular dollar figures." 871 F.2d at 588.

### III

The issue in this case is whether the common law of admiralty permits the CBA to distinguish between ill and injured seamen when setting the maintenance rate, where there is no indication that the distinction between ill and injured seamen was actually negotiated[1] – Plaintiff does not argue that the rate of $8.00 per day would be unenforceable if it resulted from a negotiated collective bargaining agreement that was uniformly applied to all seamen.

Few reported decisions have considered the propriety of distinguishing between ill and injured seamen.[2] The sole court to directly consider the permissibility of this distinction has found it to violate the common law of admiralty. *Vitco v. Joncich*, 130 F. Supp. 945 (S.D. Cal. 1955), *aff'd*, 234 F.2d 161 (9th Cir. 1956). *Vitco* involved a provision of a collective bargaining agreement

---

[1] The district court considered "the weekly $244.00 'contractual support benefit' simply to be an increased maintenance payment for injured seamen." *Skowronek v. Am. S.S. Co.*, No. 05-73961, 2006 WL 1494947, at *3 (E.D. Mich. May 25, 2006). Defendant does not dispute this contention and an independent interpretation of the CBA also supports this conclusion.

[2] The fact that so little law exists on this subject may itself be an indicator of the general tendency to consider the rights of ill and injured seamen to be coterminous.

that denied the right of wages for the full period of employment, which is a right that "the maritime law attaches to the seaman's contract of employment," to ill but not to injured seamen.[3] *Id.* at 949. *Vitco* reasoned that because ill seamen did not receive a corresponding advantage, the historical considerations of maritime law and public policy compelled the court to declare as *pro tanto* void a collective bargaining agreement that, "without quid pro quo[,] deprives a seaman of wages because of unavoidable illness during the term of his employment." *Id.* at 951.

The majority claims that the "critical" distinction between this case and *Vitco* is that *Vitco* involved an "entire abrogation" of the right to the earnings of the vessel. Majority Op. at 5. This distinction is implausible and artificial. Under the contract in *Vitco*, ill seamen were paid part, but not all, of their wages for the voyage, in derogation of their admiralty law right "to recover [their] full wages." *Pac. Mail S.S. Co. v. Lucas*, 264 F. 938, 941 (9th Cir. 1920). Presumably, the majority reasons that because *Vitco* concerned seamen's right to their *full* wages, any diminution of wages was an entire abrogation of that right. Linguistically and logically, this is a perfectly plausible reading of "entire abrogat[ion]" in *Al-Zawkari*, 871 F.2d at 588. But were this reading correct, the decreased rate of maintenance at issue in *Al-Zawkari* would entirely abrogate the right to maintenance, which is the right to comparable conditions to those furnished at sea. *Taylor*, 303 U.S. at 528. Clearly, "entire abrogation" as used in *Al-Zawkari* means something other than paying less than the full amount of an obligation imposed by admiralty law.

In any event, *Vitco* makes clear that the discrimination between ill and injured seamen was the primary problem with the collective bargaining agreement in that case. *See* 130 F. Supp. at 950. For the majority's distinction between *Vitco* and the instant case to have any force, it would have to be true that the provision in *Vitco* would have been void notwithstanding its discriminatory character. Nothing in *Vitco* suggests that it considered this to be the case.

The Supreme Court has also declined an invitation to distinguish between ill and injured seamen. In *Aguilar*, the seaman was injured when traversing the only available route to the moored ship while on shore leave. 318 U.S. at 725. The shipowner suggested that ill seamen who caught infectious diseases while on shore leave should be entitled to maintenance on account of the problems of proof that would arise in determining when the seaman contracted the disease, while no such problems would arise with injured seamen, to whom maintenance could be denied. The Supreme Court refused to credit such a difference:

> [C]ases of illness, which are within the reason and policy of the liability, are indistinguishable from cases of injury received without misconduct. The risk of incidence is not less in the one case than in the other. The afflicted seaman is made as helpless and dependent by injury as by illness. His resources for meeting the catastrophe and his employer's burden are not greater because he is hurt rather than ill.

318 U.S. at 735 n.23.

---

[3] The contract provision at issue in *Vitco* stated:

> In event illness incapacitates any crew member from further work on board the vessel, he shall be entitled to receive his proportionate share of the earnings of the vessel to the date and hour said member leaves the boat. Upon regaining his health, he shall be reemployed on the boat. During illness, such member may be substituted for by another man. An ill member cannot demand his share while ashore. This paragraph does not pertain to a member injured on the boat.

*Vitco*, 130 F. Supp. at 950.

The Supreme Court has been equally unwilling to classify seamen in their entitlement to maintenance in other contexts. In *Farrell*, the Supreme Court rejected the contention that the amount of maintenance was dependant upon the seaman's negligence. 336 U.S. at 516. This conclusion was perfectly consistent with the nature of maintenance, because "logically and historically, the duty of maintenance and cure derives from a seaman's dependence on the ship, not from his individual deserts, and arises from his disability, not from anyone's fault." *Id.* at 515-16. These historical foundations also suggest that the ill seaman's right to maintenance is coextensive with that of the injured seaman because these considerations are equally applicable to ill and injured seamen.

Against this, there does not appear to be any case affirming a distinction between an ill and injured seamen's entitlement to maintenance. Thus, the weight of the law counsels against distinguishing between ill and injured seamen in their right to maintenance. It remains to be considered whether the rationale of *Gardiner*, as adopted by this Court in *Al-Zarkawi*, compels a different conclusion.

Insofar as *Al-Zarkawi* is premised on the need to avoid overt legislation of a particular dollar figure, such a policy is inapplicable here. 871 F.2d at 588. The CBA specifies an alternate rate of maintenance, that reserved for injured seamen, and the district court awarded Plaintiff maintenance in this amount.

Likewise, we should be reluctant to give significant weight to the argument that the economic strength of unionized seamen requires the Court to acquiesce in the terms of the CBA, even when those terms are in tension with the common law of admiralty. *See Ammar*, 342 F.3d at 146. As a factual matter, the premise of this argument is questionable. Though it is perhaps true that unions increase the economic power of their members, it is somewhat less clear that this increased power has eliminated the need for courts to ensure that seamen are economically protected against the hardships that accompany illness or injury. *See* Eugene A. Brodsky & Karen M. Houston, *From Subsistence to Starvation: A Call For Judicial Reexamination of* Gardiner v. Sea Land Service, Inc., 9 U.S.F. Mar. L.J. 71, 98 (1996) (noting that maintenance is frequently a seaman's only source of support in the event of illness or injury); Guido Calabresi, The Costs of Accidents 56 (1970) ("[P]eople cannot estimate rationally their chances of suffering death or catastrophic injury."). Yet irrespective of the resolution of this factual matter, as a legal matter, the Supreme Court has continued to consider seamen the wards of admiralty courts notwithstanding the onset of unionization. *See Chandris, Inc.*, 515 U.S. at 354-55; *Vaughan*, 369 U.S. at 532. This policy must control over any contrary considerations expressed in *Ammar*.

A closer question is presented by the argument that, much like in *Al-Zarkawi*, the Court should enforce the terms of the CBA, provided that they derived from a negotiated collective bargaining process. Theoretically, there is no apparent reason why a fair bargaining process between two actors of approximately equal strength could not produce the collective bargaining agreement here. Nevertheless, I would not extend this reasoning to the facts of this case. In *Al-Zarkawi*, the parties stipulated that the maintenance rate had been considered along with other matters during collective bargaining negotiations, giving rise to a presumption that the rate was arrived at through negotiations. 871 F.2d at 588 n.3. *Accord Gardiner*, 786 F.2d at 949 ("The facts in this case demonstrate that there was real bargaining over the maintenance rate"). Were there evidence in the record in the instant case that the distinction between ill and injured seamen was actually negotiated, a different result might follow. But no record evidence supports this conclusion, and actual good faith bargaining should not be inferred merely from the fact that the $8.00 rate is found in the CBA.

The nature of the provision at issue provides good reason to refuse to infer good faith negotiations solely from the CBA itself. The CBA speaks only to "injury," leaving the lower rate

paid upon illness to arise by implication. Whether this result was actually negotiated, or even intended at all, is not disclosed in the record. The CBA must be evaluated in its historical context, where distinctions between ill and injured seamen have rarely been offered, and never accepted. Nothing about the circumstances of ill and injured seamen immediately suggests a rational basis for distinction. *See Aguilar,* 318 U.S. at 735 n.23; *Vitco*, 130 F. Supp. at 950. Assuming that a negotiated CBA could alter the protections ensured by the common law of admiralty, the task at hand would not be merely to interpret the terms of the CBA, but rather to determine whether the CBA reflects a negotiated bargaining process that entitles it to enforcement notwithstanding the historical principles of maintenance. On this record, the CBA fails this test.

## IV

The majority's leading argument against this analysis rests on a false cry of *stare decisis*. Majority Op. at 5 ("The dissent's approach is contrary to this Court's precedent, and for that reason alone, it must be rejected"). In order to conclude that this analysis conflicts with binding precedent, the majority latches on to *Al-Zawkari*'s statement that "when a benefits package includes an express reference to a precise rate of maintenance, *it must be presumed that this rate was arrived at by negotiation*." *Id*. (citing *Al-Zawkari*, 871 F.2d at 588). This is a distorted reading of *Al-Zawkari*. When considered in its context, *Al-Zawkari*, like *Gardiner*, provides little support for the presumption that the majority fabricates today.

The majority twice references *Al-Zawkari*'s above-quoted statement to support its holding that any rate of maintenance occurring in a collective bargaining agreement must have been presumed to occur though collective bargaining. Each time, the majority omits the first part of the sentence. The complete sentence is: "The *Gardiner* court reasoned that 'when a benefits package includes an express reference to a precise rate of maintenance,' [*Gardiner*, 786 F.3d at 949], it must be presumed that this rate was arrived at by negotiation." *Al-Zawkari*, 871 F.2d at 588. In context, it is clear that *Al-Zawkari* was summarizing and adopting *Gardiner*'s reasoning, not creating a new legal rule. *Gardiner*, however, clearly indicates that its decision is premised on *actual* negotiation, not a "presumption" of negotiation:

> A second consideration which persuades us the bargained for rate should be enforced is that the *facts in this case demonstrate that there was real bargaining over the maintenance rate*. . . . We hold that when a benefits package includes an express reference to a precise rate of maintenance, the adequacy of this rate, considered in isolation, is not a subject for judicial speculation when the rate is part of a total package of wages and benefits resulting from the process of collective bargaining.

*Gardiner*, 786 F.2d at 949 (emphasis added).

Thus, *Al-Zarkawi*'s reference to a "presumption" of negotiation must be understood by reference to its factual background of actual negotiation. Were there any remaining doubt of this, a footnote, which occurs at the end of the quoted sentence, which the majority also omits, would seem to lay the matter to rest:

> In the instant case, as in *Gardiner*, the rate of maintenance was the result of the negotiations conducted between the parties. It was stipulated that . . . ["t]he daily rate payable for maintenance as well as all other matters properly the subject of collective bargaining were considered during negotiations in 1975, 1978 and 1981.["]

*Al-Zawkari*, 871 F.2d at 588 n.3. Thus, read in context, the "presumption" referenced in *Al-Zawkari* is properly understood as a presumption that the maintenance rate "is the ultimate result from give and take collective bargaining between the parties and should be binding on them," which arises

from evidence that the maintenance rate itself was subject to negotiation. *See id.* at 588; *Gardiner*, 786 F.2d at 949 ("Here, the parties to the agreement included the traditional right to maintenance as a subject of the negotiating process. . . . We cannot fairly say that this rate, as a consequence of the normal 'give and take' process of collective bargaining, is not entitled to the same reliability accorded to other terms and conditions within the same agreement").

In effect, *Gardiner* and *Al-Zarkawi* replaced the substantive guarantee of the common law of maintenance with a procedural one. This decision can certainly be justified. By its nature, the common law right to maintenance was perpetually uncertain and subject to adjustments in tandem with the cost of food and lodging. *See* Kenneth G. Engerrand, *Primer on Maintenance and Cure*, 18 U.S.F. Mar. L.J. 41, 90-91 (2006). Courts have been understandably hesitant to replace an agreed rate of maintenance with one that emerges through litigation if the agreed rate was generated by a fair procedure, which would be abrogated by judicial intervention. But regardless of whether that reasoning should be extended to other aspects of the right to maintenance, there is certainly no justification for making the seaman demonstrate an unfair procedure, as opposed to requiring the shipowner demonstrate a fair one.[4] The shipowner, who was likely an actual party to the negotiations, is substantially more likely to have access to evidence of what occurred at the bargaining table. More importantly, the policy of admiralty law unequivocally resolves issues such as these in favor of the seamen. *See Vaughan*, 369 U.S. at 531-32; *Hardon*, 11 F. Cas. at 485 (holding that "the most rigid scrutiny is instituted into the terms of every contract[] in which [seamen] engage").

In its entirely unpersuasive attempt to argue that the seaman must shoulder the burden of demonstrating that collective bargaining procedures are unfair, the majority misunderstands the reasons for inquiring into the fairness of the CBA negotiations in the first place. The majority seeks to justify placing the burden of demonstrating an unfair procedure on the seaman on the grounds of "the presence of the maintenance rate in a mutually agreed upon CBA that governs the relationship between the shipowner and the seaman." Majority Op. at 5. This argument, however, misses the essential point that the justification for allowing maintenance rates in a CBA to trump the protections ensured by the common law of admiralty is that the terms have been freely contracted to by both the shipowner and the seamen during a fair negotiation process. *See Al-Zarkawi*, 871 F.2d at 588; *Gardiner*, 786 F.3d at 948. When this fair bargaining process has not displaced the common law of admiralty's protections, the latter must prevail in as much as admiralty's paramount objective is the protection of the seaman. Thus, in a seaman's action for maintenance, the shipowner should appropriately bear the burden of demonstrating as an affirmative defense that the common law duty to provide maintenance has in fact been modified by the maintenance provisions of a fairly negotiated CBA. By narrowly focusing on *Al-Zarkawi*'s conclusion that a mutually agreed upon CBA can displace admiralty law's protections, the majority has failed to see that *Al-Zarkawi* was announcing an exception to the general rule, the conditions of application of which would still need to be established in every case.

In addition to its misplaced reliance on *Al-Zarkawi*, the majority reasons that jettisoning the historical tradition of construing admiralty rights in favor of seamen is necessary in order to protect our national labor policy. According to the majority, court "interven[tion] in privately-negotiated CBAs . . . rejects the reasoning" of this Court's precedents; the conclusion that courts still have a role in protecting even unionized seamen "questions the premise upon which national labor policy

---

[4]The majority's citation to *Al-Zarkawi* and *Gardiner* for the proposition that Plaintiff bears the burden of demonstrating unfairness is misplaced. As discussed above, neither case addressed this question, because in those cases the relevant facts were stipulated or taken as given.

has been built according to the Supreme Court."**5** Majority Op. at 6. The majority's dogmatic approach to collective bargaining agreements simply ignores the nuance in this area of the law. Reconciling admiralty law with labor law does not necessarily involve removing any substantive or procedural protections created by the former if they might constrain the latter. *Al-Zarkawi*'s holding that the right to maintenance cannot be entirely abrogated represents an enduring substantive protection, *see* 871 F.2d at 588; it could not easily be justified if any interference with collective bargaining agreements truly threatened labor policy. Heightened scrutiny of the process leading to a collective bargaining agreement in derogation of the common law is similarly compatible with labor law, as are the other substantive components of the right to maintenance that have persistently been assumed to attach to that right. *See, e.g.*, *Vaughan*, 369 U.S. at 529-30 (no duty to mitigate damages); *Aguilar*, 318 U.S. at 733 (maintenance applies when on shore leave); *Farrell*, 336 U.S. at 516 (the right to maintenance exists irrespective of negligence).

Because Defendant has not shown that a fair bargaining process was employed to abrogate the common law, I would not reach the more difficult issue of whether any procedure would be competent to allow enforcement of the CBA before this Court. While the majority does not appear troubled by this question, *Gardiner*, for one, suggested that *Vitco* would prevail in the case of discrimination between ill and injured seamen:

> In *Vitco*, the district court invalidated a contract provision which allowed the employer to withhold the unearned wages of seamen incapacitated due to illness while preserving the unearned full wages for seamen incapacitated due to injury. . . . Unlike the contract in *Vitco,* "which without *quid pro quo* deprive[d] a seamen of wages because of unavoidable illness during the term of his employment," the contract here does not abrogate a maritime right.

786 F.2d at 950 (alteration in original) (citation omitted) (quoting *Vitco*, 130 F. Supp. at 951). Furthermore, this issue is disturbing because there is no rational basis for distinguishing this feature of the common law right to maintenance–the majority does not even purport to claim that admiralty law supports its conclusion–from the other features of maintenance that the Supreme Court has determined that the common law protects. Perhaps a future panel of this Court will tell us that when the Supreme Court stated that the right to maintenance was not contingent on negligence, *Farrell*, 336 U.S. at 516, or did not require seamen to mitigate damages, *Vaughan*, 369 U.S. at 529-30, it merely meant that this was the rule unless a collective bargaining agreement said otherwise. While these hypothetical decisions would seem inconsistent with Supreme Court precedent, they would be in perfect harmony with today's decision, which has unmoored maintenance from the very policies that justify it.

For the foregoing reasons, I respectfully dissent.

---

**5**It is noteworthy that the Supreme Court, when considering a unionized seaman's right to maintenance, did not even consider the collective bargaining agreement worthy of mention, notwithstanding the fact that the court of appeals had discussed it. *Compare Vaughan*, 369 U.S. at 528-34 (no mention of union contract), *with Vaughan v. Atkinson*, 291 F.2d 813, 819 (4th Cir. 1961) (Sobeloff, J. dissenting) ("The court's opinion makes reference to the provision in the union contract requiring the employer to pay $8.00 per day as maintenance. This provision will be read in vain for any suggestion that there may be a set-off of any kind from the allowable maintenance").