**Darrell Edward STEVENS, Plaintiff–Appellee, Cross–Appellant,**

v.

**McGINNIS, INC., Defendant–Appellant, Cross–Appellee.**

Nos. 94–6091, 94–6404.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 9, 1996.

Decided May 7, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied June 13, 1996.*

* Judge Wellford would grant rehearing for the     reasons stated in his dissent.

Gregory G. Moser (briefed), Covington, KY, Meredith Lynn Lawrence, Crestview Hills, KY, for plaintiff–appellee.

Todd M. Powers (briefed), Schroeder, Maundrell, Barbiere & Powers, Cincinnati, OH, for defendant–appellant.

Before: BROWN, WELLFORD, and MILBURN, Circuit Judges.

BAILEY BROWN, Circuit Judge.

In this maritime common law case, Stevens, formerly a towboat deckhand and pilot, sued McGinnis, Inc. ("the company"), his former employer, for maintenance and cure resulting from the removal of a tumor which afflicted him during his employment with the company.[1] After a bench trial the district court found that the tumor caused certain symptoms, e.g., headaches and personality changes, from which Stevens suffered during his employment, and thus that the tumor manifested itself during Stevens's service to the company. The district court therefore awarded maintenance and cure to Stevens. The company appeals the district court's judgment. Stevens cross-appeals the court's refusal to award him attorney's fees. For the reasons set forth below, we AFFIRM the district court's judgment.

---

1. Stevens originally filed this suit seeking maintenance and cure under maritime common law and damages under the Jones Act, 46 U.S.C. App. § 688 (1988). The district court severed the maintenance and cure claim from the Jones Act claim. Only the maintenance and cure claim is before this court.

## I. FACTS

The company, which operates barges and towboats on the Ohio River, employed Stevens, first as a deckhand and later as a pilot, from 1985 until 1992. Stevens's years with the company were marred by alcoholism and occasional fighting with coworkers. He was, however, a generally agreeable worker prior to March of 1991. At that time, Stevens fell on the deck of a towboat and suffered a blow to the head and neck. He reported the fall to his supervisor, but did not seek medical attention. After the fall, Stevens began complaining of headaches. Throughout the next year and a half, the headaches grew so frequent that Stevens "complained continuously," according to his supervisor, Michael Carey. Moreover, Carey testified that Stevens's personality changed after his fall. While he was admittedly a quick-tempered and occasionally violent man before he fell, after the fall Stevens had considerable difficulty relating to his fellow employees and handling even minor job-related problems. Stevens's headaches grew severe and his disposition even poorer. In Carey's words, "it was like dealing with just a different person."

Stevens's employment problems culminated on December 8, 1992, when he fought with another employee and allegedly threatened Carey with a gun (Stevens denies that he threatened Carey). The company fired both Stevens and Carey on that day.

Five months later, Stevens entered a hospital seeking treatment for alcoholism and stomach ulcers. While in the hospital, Stevens underwent a CAT scan which revealed a baseball-sized glomus vagale tumor in his neck below his right ear. A glomus vagale tumor is a very rare, noncancerous type of glomus jugulare tumor (also known as a paraganglioma) which occurs in the head and neck. This particular type of tumor occurs so infrequently that there are only approximately one hundred reported cases of them in medical literature. In June of 1993, a surgeon, Dr. Deutsch, removed the tumor from Stevens's neck. Thereafter, Stevens's headaches subsided and his personality improved. According to his family physician, Dr. Poore, Stevens became "a model citizen" after his surgery and recuperation. The company argues, however, that Stevens's improved condition also corresponded with an apparently successful treatment for alcoholism.

After the surgery, Stevens, who is characterized by his attorney as a "homeless pauper" who is "completely penniless," requested that the company provide him maintenance and cure payments to help defray his living expenses and the costs of his surgery and recuperation. The company refused, and Stevens filed this suit.

After a bench trial, the district court found, as a matter of fact, that the tumor caused Stevens's headaches and personality changes.[2] The court thus concluded that the tumor "manifested itself" during Stevens's employment with the company. Therefore, the district court ordered the company to pay maintenance to Stevens beginning on the day of the termination of his employment through the point at which he reaches maximum cure, in the amount of twenty dollars per day. Moreover, the court ordered the company to pay the "medical expenses for the treatment of his tumor ... during the same period." The court held, however, that "since the law in this situation was not clearly established, the [company] is not liable for ... attorney's fees."

The company appeals the judgment of the district court, claiming that the court's findings of fact were clearly erroneous, and that it erred in holding that maritime common law requires it to pay maintenance and cure to Stevens. Stevens cross-appeals, claiming he is entitled to attorney's fees.

## II. ANALYSIS

### A. The district court's factual findings are not clearly erroneous.

We review a district court's findings of fact for clear error. Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when al-

---

**2.** The district court, however, specifically refused to make a finding regarding whether Stevens's fall affected the tumor.

though there is evidence to support it, the reviewing [court] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* 508 U.S. 602, 622, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

■ At trial, the district court considered the testimony of four physicians; two called by each side. Predictably, the two doctors Stevens called, Dr. Poore (Stevens's family physician) and Dr. Martin, testified that the tumor probably caused the headaches and personality problems Stevens endured between his fall and his surgery. The company's physicians, Dr. Deutsch (who actually removed the tumor) and Dr. Geier, testified that it was unlikely that the tumor caused Stevens's problems. Without going into detail regarding the scientific testimony, suffice it to say that the experts on both sides offered scientific rationale tending to support their conclusions, and that one cannot satisfactorily reconcile the differing opinions.

Perhaps the most compelling evidence presented concerning the tumor was how rare this type of tumor actually is. As noted above, only approximately one hundred similar tumors are known to have occurred. It is therefore difficult to know exactly what effects such a tumor could produce. The district court thus had to make a difficult finding based on conflicting evidence regarding a rare tumor. The only undisputed facts were that the tumor existed during Stevens's employment with the company, and that Stevens's symptoms subsided after the tumor was removed.[3] After a review of the record, we are not left "with a definite and firm conviction" that the district court made a mistake. Thus, we conclude that the district court did not clearly err in finding that the tumor caused Stevens's headaches and personality changes from which he suffered during his employment. *Cf. Sentilles v. Inter-Caribbean Shipping Corp.,* 361 U.S. 107, 109,

80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959) (holding that a jury may draw an inference as to the cause of an illness despite the lack of unanimity among experts as to the cause).

### B. The company must provide maintenance and cure to Stevens.

■ Assuming the district court's factual conclusions to be correct, whether the doctrine of maintenance and cure is broad enough to include Stevens's claim is a legal question, and thus we review it *de novo. United States v. Spinelle,* 41 F.3d 1056, 1057–58 (6th Cir.1994).

#### 1. Maintenance and Cure Law

In *Blainey v. American Steamship Co.,* 990 F.2d 885 (6th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 346, 126 L.Ed.2d 311 (1993), we provided the following basic synopsis of maintenance and cure law:

> Rather than relying upon the protection of workers' compensation statutes, seamen who suffer illness or injury on the job look to a unique package of remedies. Due to "historical tradition and the realization that seamen are required to endure special perils and hardships," federal common law of the sea accords seamen special relief not available to other workers, including maintenance [and] cure.... Thomas J. Schoenbaum, *Admiralty and Maritime Laws* § 5–1 (1987). Maintenance refers to a shipowner's obligation to provide a mariner with food and lodging if he becomes injured or falls ill while in service of the ship, while cure alludes to the duty to provide necessary medical care and attention. *See Al–Zawkari v. American S.S. Co.,* 871 F.2d 585, 586 n. 1 (6th Cir.1989). A shipowner is liable to pay maintenance and cure to the point of maximum cure, that is, when the seaman's affliction is cured or declared to be permanent. *See Farrell v. United States,* 336 U.S. 511, 517–19, 69 S.Ct. 707, 710-11, 93 L.Ed. 850 (1949).

*Blainey,* 990 F.2d at 886–87.

■ The shipowner's obligation to pay maintenance and cure stems from two basic

---

**3.** As indicated above, however, the company argues that the symptoms subsided because Stevens had quit drinking.

policy concerns recognized by maritime law for hundreds of years. *See* Martin J. Norris, *The Law of Seamen* § 26:4 (1985) (stating that the roots of the obligation to pay maintenance and cure are found in medieval sea codes). These two policy concerns are (1) the well-being of seamen aboard ship and in foreign ports, and (2) the importance of a capable merchant marine to the economic and military security of a nation. Justice Story, sitting as a circuit judge, once stated the concerns underlying maintenance and cure as follows:

> Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment.... If [the costs of maintenance and cure] are a charge upon the ship, the interest of the owner will be immediately connected with that of the seaman. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well as to prevent diseases, as to insure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate.... Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation.... Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude and at lower wages.

*Harden v. Gordon,* 11 F. Cas. 480, 483 (C.C.D.Me.1823) (No. 6,047); *see also Vella v. Ford Motor Co.,* 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1382–83, 43 L.Ed.2d 682 (1975) (stating that the duty to pay maintenance and cure encourages maritime commerce and assures the well-being of seamen).

▮ Over the years, the courts have broadened the duty to pay maintenance and cure. It is now well-settled that maintenance and cure is payable even though the shipowner is not at fault, and regardless of whether the seaman's employment caused the injury or illness. *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 527, 58 S.Ct. 651, 652, 82 L.Ed. 993 (1938). In *Taylor,* the Supreme Court established that the duty to pay maintenance and cure does not necessarily end with the voyage on which the seaman falls ill, but can continue beyond that voyage. The Court wrote that.

> whether the seaman is at home or abroad, his right to maintenance and cure may outlast the voyage. The policy underlying the obligation, so cogently stated by Justice Story in *Harden v. Gordon,* ... and the liberality with which admiralty courts have traditionally interpreted rules devised for the benefit and protection of seamen who are its wards ... call for some extension of the duty beyond the term of service.

*Id.* at 529, 58 S.Ct. at 654. The Court determined, however, that, in cases where the seaman suffers from a disease "which *manifests* itself during his employment, but is not caused by it," the shipowner's duty is to expend such funds as are necessary only to put the seaman in such condition "as reasonably may be expected to result from nursing, care, and medical treatment." *Id.* at 530, 58 S.Ct. at 654 (emphasis added). Thus, the shipowner is not required to support the ill seaman for the rest of his life.[4]

▮ The *Taylor* opinion had a major impact on maintenance and cure law. Beyond its actual holding, the opinion reaffirmed that seamen are considered wards of the court, and that the rules devised for their "benefit and protection" should be construed liberally. Also, it added the term "manifests itself" to the maintenance and cure lexicon, so that the following rule is often repeated: A shipowner must pay maintenance and cure for any illness or injury which occurred, was aggravat-

---

4. The Court expressly reserved, however, the question of the shipowner's duty where the seaman is injured or made ill as a result of his employment. *Taylor,* 303 U.S. at 530, 58 S.Ct. at 654.

ed, or *manifested itself* while the seaman was in the ship's service. Norris, *supra*, at § 26:21.

Since *Taylor*, the Supreme Court has heard four maintenance and cure cases: *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 737, 63 S.Ct. 930, 937, 87 L.Ed. 1107 (1943) (holding that a seaman is entitled to maintenance and cure even if he falls ill or is injured while ashore, as long as he is subject to the call of duty); *Farrell v. United States*, 336 U.S. 511, 517, 69 S.Ct. 707, 710, 93 L.Ed. 850 (1949) (holding that a seaman who overstays his shore leave and injures himself through his own negligence is entitled to a reasonable period of maintenance and cure, but not to maintenance and cure for life); *Vaughan v. Atkinson*, 369 U.S. 527, 533, 82 S.Ct. 997, 1001, 8 L.Ed.2d 88 (1962) (holding (1) that a sick seaman who is forced to work because his former employer refuses to pay maintenance and cure is not required to set off his earnings against a maintenance and cure award, and (2) that the seaman may recover attorney's fees as damages when the former employer unreasonably refuses to pay maintenance and cure); and *Vella v. Ford Motor Co.*, 421 U.S. 1, 4, 95 S.Ct. 1381, 1383, 43 L.Ed.2d 682 (1975) (reversing this court and holding that an injured seaman shall recover maintenance and cure until his injury is declared permanent, not just until it becomes permanent). In each case, the Court refused the opportunity to restrict the scope of maintenance and cure liability. In fact, in all four cases, the Court commented on the "breadth and inclusiveness of the shipowner's duty." *Vella*, 421 U.S. at 4, 95 S.Ct. at 1383 ("[T]he breadth and inclusiveness of the shipowner's duty assure its easy and ready administration for '[i]t has few exceptions or conditions to stir contentions, cause delays, and invite litigations.'" (quoting *Farrell*, 336 U.S. at 516, 69 S.Ct. at 709)); *Aguilar*, 318 U.S. at 730–31, 63 S.Ct. at 933–34 ("So broad is the shipowner's obligation, that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility."); *Farrell*, 336 U.S. at 516, 69 S.Ct. at 709 ("It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered

without technical considerations."); *Vaughan*, 369 U.S. at 532, 82 S.Ct. at 1000 ("[T]he shipowner's liability for maintenance and cure [is] among 'the most pervasive' of all and ... it [is] not to be defeated by restrictive distinctions nor 'narrowly confined.' [*Aguilar*, 318 U.S. at 735, 63 S.Ct. at 936]. When there are ambiguities or doubts, they are resolved in favor of the seaman.").

When one reviews the body of maintenance and cure law in this country, including the Supreme Court cases discussed *supra* and the numerous circuit court and district court decisions on the topic (some of which are discussed *infra*), it becomes apparent that the courts have not yet defined any distinct bounds to the shipowner's duty to provide maintenance and cure. Nonetheless, in the case before us, the company asks us to decide that the district court went too far when it awarded maintenance and cure to Stevens.

### 2. This Case

■ The company argues that, even assuming the tumor caused Stevens's headaches and personality changes, we should reverse the district court's award of maintenance and cure. The company asserts that the tumor did not actually become "manifest" until it was discovered through the CAT scan five months after the company fired Stevens. Stevens, on the other hand, contends that the tumor "manifested itself," through the headaches and personality changes, while he was in the service of the ship, *i.e.*, during his employment with the company. The parties primarily argue about the meaning of the verb "to manifest" as it is used in the cases and treatises. This argument is largely wasted. The parties fail to realize that the resolution of this case does not depend on the meaning of the verb "to manifest." The word is widely used in this context only because in *Taylor*, the Supreme Court chose it to help distinguish between illnesses and injuries actually caused by a seaman's employment and those which merely come to be known during his employment. There is no precedent binding on this court that restricts us to resolving this case based on a definition of "to manifest."

The real question facing us is: Must the company pay maintenance and cure only when a seaman's illness is diagnosed during his employment, or must the company pay maintenance and cure to any seaman whose illness caused symptoms during his employment, even if the illness is not diagnosed until after the seaman's employment terminates? Neither the Supreme Court nor this court has ever directly addressed this question. In *Vaughan v. Atkinson*, however, the Supreme Court stated that "[m]aintenance and cure is designed to provide a seaman with food and lodging when he *becomes* sick or injured in the ship's service." 369 U.S. at 531, 82 S.Ct. at 1000 (emphasis added). There is no mention of manifestation at all.

That opinion provides us with guidance. As noted above, the Court granted *certiorari* in *Vaughan* to determine whether the seaman was entitled to attorney fees, and whether the shipowner could set off wages that the seaman earned while sick against maintenance payments. In *Vaughan*, the seaman entered a hospital five days after the end of his employment with the shipowner. The hospital treated him for tuberculosis. *Id.* at 528, 58 S.Ct. at 653. After nearly two months, the hospital discharged the seaman, who then spent two years in outpatient status. Eventually, two years and five months after his voyage ended, the seaman was declared fit for duty. *Id.*

During his two years of recuperation, the seaman attempted to recover maintenance and cure from his former employer. The employer questioned the seaman's supervisors and determined that the seaman had not complained of any illness during his service aboard ship. *Id.* The employer therefore repeatedly denied the seaman's claims for maintenance and cure. *Id.* The seaman did not recover maintenance and cure until, after

a trial, the district court ordered the shipowner to pay it. *Vaughan v. Atkinson*, 200 F.Supp. 802, 803 (E.D.Va.1960). The court, however, denied the seaman's claim for attorney's fees. *Id.* at 804. After the Fourth Circuit affirmed the judgment, *Vaughan v. Atkinson*, 291 F.2d 813, 815 (4th Cir.1961), the Supreme Court heard the case and determined that the seaman was indeed entitled to attorney's fees. 369 U.S. at 533, 82 S.Ct. at 1001. In reaching its decision, the Court noted that maintenance and cure "was plainly owed [the seaman] under laws that are centuries old." *Id.* at 531, 82 S.Ct. at 1000.

While this language from *Vaughan* is arguably *dicta* since the Court granted *certiorari* to determine whether the seaman was entitled to attorney's fees, not whether he was entitled to maintenance and cure, it nonetheless persuades us to affirm the district court in this case. The *Vaughan* Court obviously believed that the seaman was entitled to maintenance and cure. Stevens, like the seaman in *Vaughan*, entered a hospital after his employment had ended. As in *Vaughan*, it is clear that Stevens became ill while "in the service of his ship." Moreover, unlike the seaman in *Vaughan*, Stevens actually did complain of his illness, *i.e.*, the headaches, during his employment. The only relevant distinction between the two cases is that Stevens was diagnosed five months after his employment terminated, rather than five days. We do not believe, however, that this difference compels a different result. In both cases, the seaman was afflicted while "in the service of his ship." That Stevens was remiss in seeking treatment does not scuttle his claim. Thus, based on *Vaughan*, we hold that Stevens is entitled to receive maintenance and cure until he reaches maximum cure.[5]

---

5. The *Vaughan* opinion also supports the several cases in which courts have awarded maintenance and cure based solely on the presence of an insidious disease during a seaman's employment. *E.g. Petition of the United States*, 303 F.Supp. 1282, 1311 (E.D.N.C.1969) ("Clearly the claim for maintenance and cure is valid even though the lung cancer may not have manifested itself while in the service of the ship. Obviously [the seaman] had the malignancy while aboard the [ship]."), *aff'd*, 432 F.2d 1357 (4th Cir.1970); *George v. Chesapeake & O. Ry.*, 348 F.Supp. 283,

287 (E.D.Va.1972) ("Obviously this malignancy was present during his daily periods of being in the service of his ship and, therefore, [the seaman] is entitled to maintenance and cure."). We need not go quite so far, however, because in this case the district court found that Stevens suffered from symptoms of the tumor while employed by the company. Unlike the seamen in *Vaughan*, *Petition of the United States*, and *George*, Stevens did complain of illness during his employment. Thus, we need not decide the

## C. Denying attorney's fees was not an abuse of discretion.

We review a district court's decision regarding whether to award attorney's fees in admiralty cases for an abuse of discretion. *Breese v. AWI, Inc.*, 823 F.2d 100, 103 (5th Cir.1987) (cited with approval in *Al-Zawkari v. American S.S. Co.*, 871 F.2d 585, 590 n. 8 (6th Cir.1989)). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *First Technology Safety Sys. v. Depinet*, 11 F.3d 641, 647 (6th Cir. 1993). The standard for awarding attorney's fees in maintenance and cure cases derives from *Vaughan v. Atkinson*, 369 U.S. at 530–31, 82 S.Ct. at 1000. In *Vaughan*, the Supreme Court awarded attorney fees after concluding that the shipowner was "callous" and recalcitrant in its "willful and persistent" refusal to pay maintenance and cure which was "plainly owed." *Id.; see also Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110, 1118 (5th Cir.1984) (same standard) (cited with approval in *Al-Zawkari*, 871 F.2d at 590 n. 8 (6th Cir.1989)).

Thus, the first step in deciding whether the seaman is entitled to attorney's fees requires us to determine whether maintenance and cure was plainly owed. The district court denied attorney's fees because it found that existing law did not clearly establish liability in this case. Thus, the court determined that the company had a reasonable defense to Stevens's claim, and therefore "did not act callously or with indifference to the seaman's plight" in denying it.

Given the similarities we find between this case and *Vaughan*, we are tempted to reverse the district court on this point. We note, however, that the district court found that liability was not clearly defined. Because the portions of the *Vaughan* opinion on which we rely are arguably *dicta*, and because that opinion's relevance completely es-

caped the parties, we hold that liability for maintenance and cure in this case was not so clear that the district court abused its discretion in denying attorney's fees.

## III. CONCLUSION

We AFFIRM the district court's judgment.

WELLFORD, Circuit Judge, dissenting.

Noting a paucity of information about the rare condition known as a glomus jugulare tumor and a conflict among the testifying experts as to whether Stevens' tumor caused his alleged headaches and personality change, the majority holds that the district court reasonably found that plaintiff established that those problems were attributable to the tumor. Unlike the majority, I am left "with a definite and firm conviction" that the district court's factual finding on this issue was erroneous. Therefore, I respectfully dissent and would reverse the award of maintenance and cure in this case.

In my view, there are two problems with the district court's finding. First, there is very little in the record, beyond Stevens' own self-serving allegations, tending to prove that Stevens actually experienced the severe headaches and personality change now alleged to be attributable to the tumor. Stevens' experts concede that his tumor could have existed asymptomatically. Although those same doctors testified that Stevens experienced headaches and a personality change, their assessment of his physical condition was based solely on information provided by Stevens. Additionally, prior to this lawsuit, the only indication that Stevens ever complained of such maladies to McGinnis or to his fellow employees was the testimony of Michael Carey, a co-worker who was fired by McGinnis on the same day as Stevens.[1] Furthermore, Stevens failed to make reference to any "personality change" in an April 18, 1994 affidavit concerning his employment with McGinnis. Finally, Stevens did not indicate to any of the various doctors involved in his 1993 treatment for alcoholism and stomach ulcers that he was suffering from

---

question of whether the mere existence of an insidious disease during a seaman's voyage entitles him to maintenance and cure from the shipowner, no matter how long it takes for the seaman to discover the disease.

1. Carey admitted that he failed to inform McGinnis of several violent episodes involving Stevens in 1991 and 1992. He further testified that he did not know that Stevens had or was treated for an alcohol abuse problem.

persistent headaches or behavioral changes. This is confirmed by the reports of Dr. James Linne, Dr. Daniel Barkdoll and therapist Tom Volker.

Even if Stevens did experience these problems, the proof is strong that they were caused by his alcohol abuse, not the tumor. Stevens, part of a family afflicted by alcoholism, has a long history of heavy alcohol abuse which began at age sixteen and continued until he began spitting up blood and sought treatment in 1993. At that time, Stevens reported that his alcohol abuse had destroyed both of his marriages and caused him to lose his job with McGinnis. During the six months prior to checking himself into the hospital, Stevens admits consuming approximately two fifths of liquor per day.

At the outset, it should be noted that, although Stevens sought at trial to link his headaches and personality change to his tumor by showing that these maladies arose after his 1991 fall, this causal connection was never established. Furthermore, the parties agree that the tumor was not caused by, or otherwise related to, Stevens' employment with McGinnis. Thus, the only evidence that Stevens' problems may have been attributable to the tumor is the testimony of Drs. Poore and Martin, which is speculative in nature.

Both Drs. Martin and Poore admitted that Stevens' tumor could have existed without causing any symptoms, but they opined that, because those problems abated once the tumor was removed, it is probable that the tumor was the source of Stevens' headaches and personality change.[2] Both doctors admitted that alcohol abuse can also produce headaches and behavioral changes of the type alleged by Stevens. Furthermore, any post-surgery changes in Stevens' condition can plausibly be explained by the fact that Stevens reportedly had attained sobriety at that time. Neither Dr. Poore nor Dr. Martin were aware of Stevens' history of alcoholism at the time of their testimony. I cannot escape the conclusion that any problems experienced by Stevens were clearly the product of his alcohol abuse.

The unquestioned medical expert on the rare condition experienced by Stevens was Dr. Rodney Geier, a board-certified Cincin-

nati radiation oncologist, who reviewed the hospital records in this case. His opinion was that the symptoms that might be expected from this type of tumor would be "hoarseness ... some difficulty swallowing, symptoms related to the vagus nerve or the tenth cranial nerve," but not headaches or personality changes. His opinion further was that he would not expect such a tumor to secrete catecholamines, and that any such secretion would not modify Stevens' behavior.

I add a few words about the majority's construction of the doctrine of maintenance and cure. In upholding the award to Stevens, the majority relies on *dicta* from *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). That case, however, is easily distinguishable from the present situation. In *Vaughan*, the seaman plaintiff checked into a hospital only five days after returning from a three month voyage. Additionally, in contrast to the case at bar, it is obvious that the defendant shipowner in *Vaughan* knew, before the end of the voyage (*i.e.*, during the employment relationship), that the plaintiff was ill, because the defendant issued the plaintiff a certificate to receive hospital treatment once the ship docked. *See id.* at 528, 82 S.Ct. at 998.

The Supreme Court has stated that the doctrine of maintenance and cure should not be "narrowly confined." *See Aguilar v. Standard Oil Co.*, 318 U.S. 724, 735, 63 S.Ct. 930, 936, 87 L.Ed. 1107 (1943). In my opinion, this admonition is not contravened by concluding that maintenance and cure does not apply to an illness, only speculatively and tenuously connected to a seaman's employment, which was first discovered six months after the seaman was terminated due to alcoholism and assaultive behavior. Further, it may be that Stevens waived any claim to maintenance and cure by failing to report the 1991 fall that allegedly activated his tumor and by failing to seek medical attention at any time while in the employ of McGinnis. *See Vella v. Ford Motor Co.*, 421 U.S. 1, 5 n. 4, 95 S.Ct. 1381, 1384 n. 4, 43 L.Ed.2d 682 (1975) (leaving open the question of whether

---

2. Dr. Poore, a family practitioner, did not review the hospital records, and agreed that he would defer to the opinion of specialists, yet he disagreed with the other doctors about the secretion of catecholamines from the tumor.

"a seaman may forfeit his right to maintenance and cure by not reporting a known injury or malady, or by refusing from the outset to allow proper medical examination, or by discontinuing medical care made available"). In any event, Stevens' condition was not manifest during his McGinnis employment.[3]

In sum, I would reverse on the basis that Stevens has not proven that his tumorous condition manifested itself during his employment with McGinnis.

---

**3.** To "manifest," according to Webster's THIRD NEW INTERNATIONAL DICTIONARY, is "to show plainly" or "to make palpably evident or certain."