RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BRENT A. ADKINS,

                *Plaintiff-Appellant*,

    *v.*

MARATHON PETROLEUM COMPANY, LP,

                *Defendant-Appellee*.

> No. 23-3418

———————————

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:17-cv-00643—Douglas Russell Cole, District Judge.

Argued: June 13, 2024

Decided and Filed: June 24, 2024

Before: CLAY, THAPAR, and MATHIS, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** S. Reed Morgan, CARLSON LAW FIRM, Killeen, Texas, for Appellant. Daniel L. Massey, THE MASSEY LAW FIRM, LLC, St. Louis, Missouri, for Appellee. **ON BRIEF:** S. Reed Morgan, CARLSON LAW FIRM, Killeen, Texas, for Appellant. Maureen A. Bickley, Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, Raymond L. Massey, Daniel L. Massey, THE MASSEY LAW FIRM, LLC, St. Louis, Missouri, for Appellee.

———————————

## OPINION

———————————

MATHIS, Circuit Judge. Brent Adkins worked as a crew member on one of Marathon Petroleum Company's inland river barges. He brought claims against Marathon under the Jones Act and general maritime law asserting that his service on the barge caused his lung function to

deteriorate.   The district court granted summary judgment to Marathon.   For the following reasons, we affirm in part, reverse in part, and remand to the district court.

## I.

From 2008 to 2012, Adkins worked on a barge for Marathon on the Ohio River.  Before he started work in November 2008, Marathon performed a medical examination on Adkins to determine his fitness to work on a barge, as required by the United States Coast Guard at the time Adkins was employed.  *See* 46 C.F.R. § 10.215(a), (d)(1) (2012).  During this examination, the Forced Vital Capacity (FVC) of Adkins's lungs measured at just 72.4% of predicted value. The Coast Guard's Navigation and Vessel Inspection Circular (NVIC) 04-08, released in September 2008, advised that any seaman whose FVC is below 75% of predicted value and who is contemporaneously suffering from one or more respiratory conditions should undergo additional tests to assess pulmonary function before being cleared for service.[1]  Nevertheless, Marathon cleared Adkins to work on the barge without restriction without subjecting him to further testing.  Adkins underwent another medical examination in March 2010 so that he could receive a tankerman's license from the Coast Guard.  This examination revealed that Adkins's FVC had declined to 69% of expected value, a result the exam report categorized as a "mild restrictive ventilatory defect."  R. 119-11, PageID 7977.  Despite this, the Coast Guard cleared Adkins for work and issued him a tankerman's license.  Marathon performed a third medical exam on Adkins in April 2012, which showed his FVC had declined all the way to 62% of expected value.  Still, Marathon cleared Adkins to work without restriction.

On March 26, 2012, about a month after his last medical examination, Adkins was working on the barge as usual when he began to feel sick.  He was "very dizzy," "delirious," and felt "like [he] was going to pass out" and "puke," so he got off the barge at the first opportunity. R. 119, PageID 7827.  Adkins went to the hospital in Cincinnati, Ohio, where the physician who

---

[1]While working for Marathon, Adkins was never diagnosed with any of those conditions: chronic bronchitis, emphysema, or COPD.  In fact, at each of his medical examinations with Marathon, he expressly denied as much on his respiratory questionnaires.  So to whatever extent Adkins relies on NVIC 04-08, that guidance document does not even apply to him.  Nonetheless, Dr. Sheila Butler testified that declining FVC values could themselves indicate lung damage even without an accompanying diagnosis. Thus, for the purpose of this opinion, we view Dr. Butler's testimony as creating a genuine dispute of material fact on that point.  *See infra* Part III.D.

treated him reported that his chief complaint was lightheadedness.  By the next day, Adkins's symptoms had subsided.  The physician diagnosed Adkins with an irregular heartbeat and heat intolerance and authorized his discharge from the hospital.  He also advised that Adkins should take "off work until [Adkins's] own cardiologist [] clear[ed him] to return to work."  R. 52-8, PageID 1935.

But Adkins never returned to work for Marathon.  Instead, he sued his former employer, claiming that his work on the barge caused his lungs to deteriorate to the point that he now requires supplemental oxygen on a near constant basis.  He initially filed suit in Louisiana state court, but that court dismissed his case on forum non conveniens grounds.  He then sued Marathon in the Southern District of Ohio.  In his amended complaint, Adkins asserted claims for negligence under the Jones Act, and claims for unseaworthiness and maintenance and cure under general maritime law, alleging primarily that repeated exposure to hydrogen sulfide and other hydrocarbon fumes while working on the barge caused his pulmonary function to deteriorate.  He also claimed that Marathon failed to pay maintenance and cure for the injuries and illnesses he sustained while working on the barge.

Marathon moved for summary judgment on all of Adkins's claims.  Adkins filed a cross-motion for partial summary judgment on his maintenance-and-cure claim.  The district court held a *Daubert*[2] hearing where it considered whether two of Adkins's proffered medical experts—Dr. Charles Pue and Dr. Glenn Gomes—offered admissible medical opinions on the cause of Adkins's lung injuries.  Thereafter, the district court granted Marathon's motion for summary judgment and denied Adkins's.  In its order, the district court excluded Dr. Pue and Dr. Gomes from offering expert medical proof on procedural and substantive grounds.

Adkins moved the district court to alter or amend its judgment.  Among other things, Adkins argued—for what appears to be the first time—that some of his claims were not premised on the theory that hydrocarbon fumes caused his lung damage and that it was instead caused by other factors.  The court denied the motion, and Adkins timely appealed.

---

[2]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

**II.**

Although we generally review the denial of a motion to alter or amend a judgment under Federal Rule of Civil Procedure 59(e) for an abuse of discretion, we review de novo when, as here, the Rule 59(e) motion sought review of a grant of summary judgment. *Columbia Gas Transmission, Corp. v. Ltd. Corp.*, 951 F.2d 110, 112 (6th Cir. 1991). Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023).

"We review the exclusion of expert testimony for abuse of discretion, even when the exclusion results in the entry of summary judgment for the opposing party." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 748 (6th Cir. 2016) (quotation omitted). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or uses an erroneous legal standard." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019) (quotation omitted); *see Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) ("Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." (quotation omitted)).

**III.**

Before the district court, Adkins argued primarily that exposure to hydrogen sulfide and other hydrocarbon fumes while working on Marathon's barge caused his lung damage. But on appeal, Adkins clarified that he is abandoning all his "exposure-related toxic tort claims." D. 33 at p.5. Instead, he challenges the district court's grant of summary judgment to Marathon on four claims: (1) negligent assignment, (2) medical negligence, (3) unseaworthiness, and (4) maintenance and cure. Adkins insists that these four claims do not relate to hydrocarbon exposure and that he can prove them without medical testimony that hydrocarbon inhalation caused his lung damage or—for his maintenance-and-cure claim—without any causation evidence at all. So, we will focus our discussion on those claims.

**A.**

*Expert Testimony.*   Before addressing the merits of Adkins's claims, we consider first whether the district court erred in excluding the testimony of Dr. Gomes and Dr. Pue, Adkins's medical experts.

The district court did not abuse its discretion in excluding Dr. Gomes's testimony.  The district court found that Adkins retained Dr. Gomes for litigation purposes and Dr. Gomes formed his opinions in anticipation of litigation, rather than in the normal course of medical treatment.  Dr. Gomes was thus a retained expert.  As a retained expert, Dr. Gomes needed to produce an expert report that complied with Federal Rule of Civil Procedure 26(a)(2)(B).  The four-page letter he wrote to Adkins's attorney did not meet Rule 26's standard.  On appeal, Adkins concedes that the four-page letter does not comply with Rule 26.  Adkins argues instead that Dr. Gomes did not need to submit a Rule 26 expert report because Dr. Gomes is his treating physician.

A party's expert-disclosure obligations for physicians differ depending on whether the physician is a treating physician or a retained physician.  "[A] party needs to file an expert report from a treating physician only if that physician was 'retained or specially employed to provide expert testimony.'" *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007) (quoting Fed. R. Civ. P. 26(a)(2)(B)).  If the physician formed his causation opinions through the course of normal medical treatment of a patient, the patient does not need to submit an expert report for litigation related to the treatment. *See id.* at 869–70.  But if the physician "formed his opinion at the request of [the patient's] counsel" and "in anticipation of litigation," courts should treat the physician as a retained expert and require compliance with Rule 26, including the production of a report. *Id.* at 869, 871 (quotation omitted).

The district court had ample reason to believe that Dr. Gomes formed his causation opinion at the request of Adkins's counsel and in anticipation of litigation.  Or, rather, not in anticipation, because litigation had already begun.  Adkins did not first visit Dr. Gomes until February 2016, several months after he sued Marathon in Louisiana state court and almost four years after he last worked on the barge.  Adkins's attorney arranged the medical appointment

with Dr. Gomes, and Dr. Gomes's clinic billed the attorney, not Adkins, for Dr. Gomes's services. And most damning, Adkins's attorney attended some of these appointments with his client. It would seem unusual for someone to have an attorney accompany him to routine doctor's appointments unrelated to litigation. The record reflects that Dr. Gomes was a retained expert. And because he was retained for litigation purposes, Dr. Gomes's failure to submit an expert report warranted excluding his testimony under Rule 37(c)(1).

A party can avoid the exclusion sanction by showing that its failure to comply with Rule 26 was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *see also Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). Adkins bore "the burden of proving harmlessness or substantial justification." *EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 634 (6th Cir. 2019) (citing *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271–72 (6th Cir. 2010)). Adkins has made no argument that his failure to produce an expert report was substantially justified or harmless.

As for Dr. Pue, the district court excluded him from giving expert testimony on the cause of Adkins's injuries for procedural and substantive reasons. Rule 26(a)(2)(B) sets forth the requirements for a retained expert's report. The report must contain "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *R.C. Olmstead*, 606 F.3d at 271 (alteration in original) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005)). The expert's report must include the "how" and "why," not just his conclusions. *Id.* And the "medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages." *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990).

Dr. Pue produced two expert reports: one on March 1, 2019, and another on October 4, 2020. The district court excluded the October 4 report because it was untimely. Adkins does not challenge the exclusion of the October 4 report.

The district court did not abuse its discretion in excluding Dr. Pue as an expert based on his March 1 report. The report is conclusory and does not meet the level of rigor and detail that Rule 26 requires. It states simply that Adkins's FVC tests showed that his lung function slowly deteriorated over the course of his employment with Marathon and that exposure to hydrogen sulfide and other toxic fumes caused that deterioration. The report contains no explanation of how hydrocarbon inhalation caused Adkins's decreased pulmonary function. It just says that hydrocarbon exposure caused Adkins's lung damage without any elaboration. The report also does not contain a complete statement of Dr. Pue's opinions, *see* Fed. R. Civ. P. 26(a)(2)(B)(i), because he continued adding new bases for his causation opinion long after he submitted it. For instance, at the *Daubert* hearing, Dr. Pue testified for the first time that hydrogen sulfide caused "airway remodeling," a theory he did not present in the report. R. 162, PageID 9966.

Adkins concedes that the district court correctly prevented his experts from testifying that hydrocarbon exposure caused his lung damage. Yet he argues that the district court erred by excluding Dr. Pue's entire opinion. He believes the district court should have allowed Dr. Pue to testify that other factors besides hydrocarbon exposure caused Adkins's injuries. But there is a simple reason why the district court focused only on that theory—it was the sole causation theory Dr. Pue offered. We cannot improve upon the district court's blunt summation of Dr. Pue's report: "Pue's entire causation theory . . . [is that] Adkins suffered a permanent, chronic respiratory condition from the aggravation of his childhood asthma caused by, and with temporal relationship to, his inhalation of H2S fumes. That's it." *Adkins v. Marathon Petroleum Co.*, 672 F. Supp. 3d 483, 501 (S.D. Ohio 2023) (internal citation omitted).

Adkins argues that Dr. Pue also opined that Marathon's failure to refer Adkins to a pulmonologist sooner contributed to his lung damage because when Adkins finally received the right pulmonological treatment, it "could not reverse the intervening damage while Adkins went untreated during his employment." D. 30 at p.50. But Dr. Pue said that hydrocarbon exposure caused the intervening damage. His report states that Adkins should have been referred to a pulmonologist before being "cleared to work in an environment with a toxic gas, such as H2S" and that the lack of treatment for his lung disease "increased his risk of severe lung injury with exposure to H2S." R. 120-9, PageID 8256. Dr. Pue did not indicate that lack of pulmonological

treatment by itself could have caused any damage to Adkins's lungs; he said that working around hydrocarbon fumes without receiving medical treatment caused the damage. We cannot decouple anything in Dr. Pue's report from his core theory that hydrocarbon inhalation caused Adkins's lung injuries, a theory Adkins concedes Dr. Pue cannot testify about. Because Dr. Pue only opined in his report that hydrocarbon fumes caused Adkins's lung damage, the district court correctly precluded Dr. Pue from testifying at trial that something else caused it.

**B.**

*Jones Act claims.* Moving to Adkins's claims, he seeks a trial on his negligent-assignment and medical-negligence claims brought under the Jones Act against Marathon. The Jones Act authorizes seamen to bring negligence actions for injuries suffered through their maritime employment. 46 U.S.C. § 30104(a); *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). The Jones Act expressly "incorporates the standards of the Federal Employers' Liability Act [FELA]." *Hopson v. Texaco, Inc.*, 383 U.S. 262, 263 (1966) (per curiam); 46 U.S.C. § 30104(a). FELA—and therefore the Jones Act—imposes "a non-delegable duty" on an employer "to provide a safe workplace for its employees." *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 448 (6th Cir. 2001). An employer breaches its duty under the Jones Act "to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known." *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 907 (6th Cir. 2006) (quotation omitted).

Plaintiffs bear the burden of proving a Jones Act negligence claim. To establish a prima facie case, a plaintiff must show: (1) he was a seaman, (2) he suffered an injury while working in the course of his employment as a seaman, and (3) his employer, or its agents, negligently played a part in causing his injury. *Rannals*, 265 F.3d at 448; *see also Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 451 (4th Cir. 2012). One way an employer can act negligently under the Jones Act is by assigning a seaman to a role that exceeds his physical capabilities. *See Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir. 1980). Another way is by failing "to provide prompt and adequate medical care to a sick or injured crewman." *Olsen v. Am. S.S. Co.*, 176 F.3d 891, 895 (6th Cir. 1999). Adkins attempts to pursue both avenues.

Seamen bringing a Jones Act claim face a reduced causation standard. A seaman "need not establish proximate causation." *Churchwell*, 444 F.3d at 907. The seaman must instead prove that "the employer's negligence is the cause, in whole or in part, of his injuries." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001). The seaman need "only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries." *Churchwell*, 444 F.3d at 907–08 (quotation omitted); *see Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957).

Because the district court properly excluded the testimony of Dr. Pue and Dr. Gomes, Adkins lacks expert medical proof showing that Marathon caused his lung damage. Adkins says he does not need any. He argues that it is within the common understanding of the jury that a person would experience health deterioration if he was given a job that exceeded his physical capacity or he did not receive proper medical treatment.

We find that Adkins needed expert medical proof to show that Marathon caused his lung damage under his negligent-assignment and medical-negligence theories. If a jury is "as capable of comprehending the primary facts and of drawing correct conclusions from them as" an expert witness, "expert testimony . . . is unnecessary." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (quotation omitted). But where the cause of an injury "would not be obvious to the lay juror," *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004), courts generally require expert proof "to establish the causal connection" between the injury and the injury-producing act, *Moody v. Me. Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987) (quotation omitted).

Although we have not specified when Jones Act claims require expert medical proof, our sister circuits have. Generally, a seaman needs expert medical proof to show causation in negligence cases unless "the nature of the injury can be understood by lay fact-finders based on ordinary knowledge and experience." *Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 207 (5th Cir. 2019). And "when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010) (internal quotation marks omitted). *Gowdy* drew a distinction between acute injuries (like breaking a leg after being hit by a car) and "cumulative trauma cases" (like developing knee and back problems after years of railroad work). 925 F.3d at 207

(citations omitted). The latter almost always necessitates expert testimony, while the former does not. *See id.*

*Gowdy* held that the seaman at issue did not need expert testimony to show that him "stepping down from a four-foot-tall ladder rung" caused his broken foot because everyday experience informs laypeople that stepping down from heights risks breaking bones. *Id.* at 208. But the court indicated the result likely would have been different had the seaman's injury been more cumulative in nature, like "developing cancer after years of toxic tort exposure." *Id.* Such a cumulative injury was at issue in *Myers*. There, the Seventh Circuit held that a railroader needed expert medical testimony to show that the wear and tear from "years of working for the Railroad" caused his joint problems. *Myers*, 629 F.3d at 643.

Adkins claims that Marathon's negligence caused his lung function to slowly deteriorate over the four years he worked on the barge. This is a cumulative trauma more akin to the railroader's joint problems in *Myers* than the seaman's broken foot in *Gowdy*. Like the *Myers* railroader, Adkins does not point to any "obvious origin" of his lung problems, *see id.*, but attributes them to four years of working "outdoors in hot weather, with pulmonary irritants of all kinds (fumes, dust allergens, etc.), doing heavy labor," D. 34 at pp.8–9, the normal wear and tear of his job. His injury also has "multiple potential etiologies," *Myers*, 629 F.3d at 643 (quotation omitted), as shown by Adkins's own arguments. Most of the litigation before the district court focused on the possibility that exposure to hydrogen sulfide and other hydrocarbon fumes caused Adkins's lung damage, but he has abandoned that causation theory before us and instead focuses on other potential etiologies. And intuitively, Adkins's injury is not easily understood "based on ordinary knowledge and experience." *Gowdy*, 925 F.3d at 207.

Adkins needed expert medical proof to show causation on his Jones Act negligence claims. He lacks any such admissible testimony, so those claims fail as a matter of law.

Adkins resists this conclusion. He contends that the district court, under Federal Rule of Civil Procedure 56(f), needed to provide him with notice and an opportunity to respond before granting summary judgment to Marathon based on lack of causation. That is so, he argues, because Marathon did not raise lack of causation in its motion for summary judgment.

But Adkins is incorrect. Marathon did argue in its motion for summary judgment that Adkins failed to create a genuine dispute of material fact on the causation component of his negligence claims.

Adkins next argues that the Jones Act entitles him to a presumption of causation. Under the rule established in *The Pennsylvania*, if a maritime defendant is in violation of a federal statute or regulation when a collision occurs, the burden of proof shifts to the defendant to prove that its violation could not have possibly caused the collision. 86 U.S. 125, 136 (1873). Over the years, some circuits have expanded *The Pennsylvania*'s rule to apply to various types of maritime accidents, not just collisions. *See Reyes v. Vantage S.S. Co.*, 609 F.2d 140, 142, 145–46 (5th Cir. 1980) (applying the rule when a seaman drowned after he jumped off the ship); *In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 108, 113–14 (3d Cir. 1996) (applying the rule to an oil spill). We have suggested that *The Pennsylvania*'s rule still applies only to collisions. *See In re Buccina*, 657 F. App'x 350, 352 (6th Cir. 2016) ("The rule of *The Pennsylvania* applies only to collisions, and a collision occurs when two moving vessels strike each other." (internal quotation marks and citation omitted)). But here, it does not matter whether the rule extends to accidents because Adkins failed to establish that his lung damage arose from an accident. We have defined an accident "as an event that takes place without one's foresight or expectation, especially one of an afflictive or unfortunate character." *Serv. Welding & Mach. Co. v. Mich. Mut. Liab. Co. of Detroit*, 311 F.2d 612, 617 (6th Cir. 1962) (citation omitted); *see Accident*, MERRIAM-WEBSTER DICTIONARY, www.merriam-webster.com/dictionary/accident (last visited May 9, 2024) (defining accident as "an unforeseen and unplanned event or circumstance"). The slow deterioration of Adkins's lung function over four years is not an "event" and thus does not fit the definition of an accident. And it is quite unlike the oil spills and drownings to which our sister circuits have applied *The Pennsylvania*'s rule. So the rule does not apply.

## C.

*Unseaworthiness claims.* Adkins brought unseaworthiness claims against Marathon under negligent-assignment and medical-negligence theories. Under the doctrine of seaworthiness, "[a] ship owner is strictly liable for personal injuries caused by his or her vessel's

unseaworthiness." *Churchwell*, 444 F.3d at 904 (internal quotation marks omitted). A seaman can prove an unseaworthiness claim by "establish[ing] that a vessel's unseaworthy condition was the proximate cause of his or her injuries." *Id.*

Marathon moved for summary judgment on Adkins's unseaworthiness claims. It argued that Adkins could not prove causation for those claims. In response, Adkins offered no argument opposing Marathon's arguments on the unseaworthiness claims.

Adkins has forfeited any challenge to the district court's grant of summary judgment to Marathon on his unseaworthiness claims. Arguments raised for the first time on appeal or in a motion for reconsideration following a district court's ruling on a motion for summary judgment are forfeited on appeal. *Johnson v. Ford Motor Co.*, 13 F.4th 493, 503–04 (6th Cir. 2021) (citations omitted). "Generally, at the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's arguments." *Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir. 2022) (emphasis removed).

Adkins argues that he did not respond to any argument about unseaworthiness because Marathon did not move for summary judgment on unseaworthiness based on causation. But that is simply untrue. In its motion for summary judgment, Marathon stated it was moving for summary judgment on all Adkins's claims, arguing that Adkins could not succeed on his unseaworthiness claims because he had no evidence of causation.

**D.**

*Maintenance and Cure.* The doctrine of maintenance and cure is an "ancient" maritime remedy dating back to at least the medieval period. *Messier v. Bouchard Transp.*, 688 F.3d 78, 82 (2d Cir. 2012) (citations omitted); *Olsen*, 176 F.3d at 894; *Skowronek v. Am. S.S. Co.*, 505 F.3d 482, 490 (6th Cir. 2007) (Clay, J., dissenting). Maintenance refers to "the shipowner's duty to provide food and lodging to a seaman who becomes ill or injured while in the service of the ship." *Skowronek*, 505 F.3d at 484 (majority opinion) (citation omitted). The right to cure is "care, including nursing and medical attention during such period as the duty continues." *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938). Maintenance and cure also encompasses a shipowner's obligation to "pay a stricken seaman's unearned wages 'at least so long as the

voyage is continued.'" *Blainey v. Am. S.S. Co.*, 990 F.2d 885, 887 (6th Cir. 1993) (footnote omitted) (quoting *The Osceola*, 189 U.S. 158, 175 (1903)). Thus, under the maintenance-and-cure doctrine, shipowners must cover a seaman's food, lodging, medical expenses, and wages if he gets hurt or sick while serving on the ship. *See id.* at 886–87.

A shipowner's obligation to pay maintenance and cure serves purposes "recognized by maritime law for hundreds of years." *Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1357 (6th Cir. 1996). Those purposes are: "(1) to protect the poor and improvident seaman while ill in foreign ports, (2) to encourage shipowners to protect the seaman's safety and health while in service, and (3) to induce employment in the merchant marine." *Skowronek*, 505 F.3d at 485 (quotation omitted).

In modern times, American courts have broadened the doctrine. *Stevens*, 82 F.3d at 1357. Now, to recover on a maintenance-and-cure claim, a seaman "need show only that (1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury." *West v. Midland Enters., Inc.*, 227 F.3d 613, 616 (6th Cir. 2000). If the illness or injury "occurred, was aggravated, or manifested itself while the seaman was in the ship's service," maintenance and cure "is payable even though the shipowner is not at fault, and regardless of whether the seaman's employment caused the injury or illness." *Stevens*, 82 F.3d at 1357–58 (emphasis removed). "Indeed, the shipowner's duty arises regardless of fault and whether or not employment on the ship actually caused the seaman's injury." *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009). Consequently, seamen bear a "relatively light" burden of proof "since recovery is not dependent on the negligence or fault of the vessel or its owner." *West*, 227 F.3d at 616 (quotation omitted).

In *Stevens*, we held that a shipowner must pay maintenance and cure to a seaman for a benign cranial tumor that doctors discovered and surgically removed several months after his employment ended. 82 F.3d at 1355, 1358–59. The tumor manifested itself during the seaman's employment in the form of severe headaches and behavioral problems, so we reasoned that the shipowner owed the seaman maintenance and cure even though it did not know the tumor caused those symptoms until after the seaman's employment ended. *See id.* at 1358–59.

More recently, the Second Circuit in *Messier* went even further. In that case, doctors performed routine blood tests after the seaman suffered a minor back injury while working on the ship, and the tests revealed that he had lymphoma. *Messier*, 688 F.3d at 80–81. The seaman was asymptomatic for the entirety of his maritime service, and he was not working on the vessel at the time of his diagnosis, so the cancer did not manifest during his employment. *See id.* The court held nonetheless that the seaman could recover maintenance and cure for his cancer treatment because the cancer developed while he was still in the shipowner's service (the district court assumed this for summary-judgment purposes). *Id.* at 84; *see also West*, 227 F.3d at 616–17 (holding that seaman was entitled to maintenance and cure for psychological treatment after captain forced him to watch a pornographic video while on the ship).

Maintenance and cure's expanse is blunted, however, by the doctrine's restrictions on how much the seaman may recover. A shipowner is liable to pay maintenance and cure only until the seaman's "condition has stabilized and further progress ended [even if] short of a full recovery." *Block Island Fishing, Inc. v. Rogers*, 844 F.3d 358, 364 (1st Cir. 2016) (quotation omitted); *see Blainey*, 990 F.2d at 887 (stating that a shipowner must pay maintenance and cure until the "affliction is cured or declared to be permanent"). "Thus, the shipowner is not required to support the ill seaman for the rest of his life." *Stevens*, 82 F.3d at 1357; *see also Travis v. Motor Vessel Rapid Cities*, 315 F.2d 805, 811 (8th Cir. 1963) (holding that maintenance and cure does not extend to "chronic or incurable" illnesses). The seaman's recovery is limited to out-of-pocket expenditures, not expenses covered by his medical insurance or any other source. *See Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 588 (6th Cir. 1989). It is common for shipowners to contractually limit how much maintenance a seaman may recover, and we have upheld such limits. *See Skowronek*, 505 F.3d at 483 (upholding contractual maintenance rates of $56 per week for sick seamen and $300 per week for injured seamen).

Adkins presented evidence that creates a genuine dispute of material fact about whether his lung problems manifested while he was in Marathon's service. One of Adkins's medical experts, Dr. Butler, testified that Adkins's FVC values showed that he was not medically qualified to work on the barge. This testimony indicates that Dr. Butler views Adkins's FVC values as a manifestation of lung problems. If they are a manifestation of Adkins's lung

problems, then the problems occurred while he was in Marathon's service. *See West*, 277 F.3d at 616. Marathon performed the medical exams that revealed Adkins's FVC levels, and Adkins underwent those exams as part of his job. And even if Adkins's lung problems first developed before he worked for Marathon, his declining FVC values could indicate that his issues were aggravated during his service, still entitling him to maintenance and cure. *See Stevens*, 82 F.3d at 1357. Furthermore, it is undisputed that Adkins had a hospital stay on May 26-27, 2012, and the medical episode that prompted that hospital stay occurred while Adkins was on the barge. Adkins may recover maintenance and cure stemming from that incident even if it had nothing to do with his lung problems.

Marathon argues that it was entitled to summary judgment on Adkins's maintenance-and-cure claim because Adkins's lung issues manifested after his service with Marathon concluded. True, Adkins's pulmonary issues were diagnosed after his employment with Marathan ended. But our precedent shows that injuries can manifest before they are diagnosed, as was the case with the seaman's tumor in *Stevens*. *See* 82 F.3d at 1358–59.

Marathon also argues that Adkins forfeited any challenge to the dismissal of his maintenance-and-cure claim by not responding to Marathon's maintenance-and-cure arguments at the summary-judgment stage. But Adkins cross-moved for summary judgment on his maintenance-and-cure claim, thus preserving his challenge. And, in any event, "[w]hether or not forfeiture occurred below, we would exercise our discretion to excuse it." *Mosier v. Evans*, 90 F.4th 541, 555 (6th Cir. 2024).[3]

## IV.

For the reasons stated, we **AFFIRM** the district court's grant of summary judgment to Marathon on Adkins's Jones Act negligence claims and his unseaworthiness claims, **REVERSE**

---

[3]Adkins is not out of the water yet. He faces two additional bars to recovery. First, a shipowner is not liable for cure if a seaman's condition is chronic or declared to be permanent. *See Blainey*, 990 F.2d at 887. That might well be the case here. Second, the maintenance-and-cure doctrine does not allow double recovery. So a seaman cannot recover cure for expenses relating to his illness that were covered by insurance or some other source. *See Al-Zawkari*, 871 F.2d at 588–89. We decline to address these points here and instead leave them to the district court.

the district court's grant of summary judgment to Marathon on Adkins's maintenance-and-cure claim, and **REMAND** for further proceedings consistent with this opinion.